**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| CASTILLO CONSTRUCTION AND MANAGEMENT LLC, JOHN CASTILLO, and SOUTHWEST ELITE REAL ESTATE INC. on behalf of themselves and all others similarly situated, | Case No. _____ |
|       Plaintiffs, | |
|   vs. | |
| PERMIAN RESOURCES CORP. F/K/A CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and PIONEER NATURAL RESOURCES COMPANY, | |
|       Defendants. | |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiffs Castillo Construction and Management LLC, John Castillo, and Southwest Elite Real Estate Inc. ("Plaintiffs") on behalf of themselves and all others similarly situated (the "Class" as defined below), bring this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on violations of the Sherman Act and state antitrust and consumer protection laws by Permian Resources Corporation (fka Centennial Resource Development, Inc.); Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; and Pioneer Natural Resources Company (collectively "Defendants").

## SUMMARY OF ACTION

1.     This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production, which has had the effect of fixing, raising, and maintaining the price of retail gasoline (gasoline purchased by consumers at gas stations) in and throughout the United States of America.[1]

2.     Shale oil, also called "tight oil," is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, and other commercial products sold in the U.S.

3.     Shale oil is produced by fracturing the rock formations that contain the layers of oil in a process known as hydraulic fracturing, or "fracking." Today, shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.[2]

4.     Shale oil, along with other crude oil, is sold to refineries. Refineries co-mingle shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods, then refine the crude oil into gasoline and other petroleum-based products. Crude oil is the primary upstream input in gasoline.

5.     The resulting gasoline is then transported to storage terminals, where it is stored and blended prior to sale to gas stations for onward sale to members of the Class.

---

[1] Throughout this complaint, references to "gasoline" are to retail gasoline, including but not limited to all grades and formulations sold to individual end-users at retail gasoline stations throughout the U.S.

[2] "The U.S. Energy Information Administration (EIA) estimates that in 2022, about 2.84 billion barrels (or about 7.79 million barrels per day) of crude oil were produced directly from tight-oil resources in the United States. This was equal to about 66% of total U.S. crude oil production in 2022." *How Much Shale (Tight) Oil is Produced in the United States?*, U.S. ENERGY INFO. ADMIN. (last updated Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6. Crude oil supply is measured by the number of "barrels" produced, each of which contains 42 gallons of crude oil. Daily oil production is measured in barrels per day, which is at times abbreviated as bpd, but is also b/d or B/D. Production over longer periods is often measured in millions of barrels, abbreviated as MMbbl.

6.     Gasoline is a critical commodity for American consumers. Approximately 40 million Americans fill up their vehicles every day at American gas stations.[3] Gasoline purchases account for approximately 5% of U.S. consumer household spending per year, with the average car consuming approximately 500 gallons of gasoline each year.[4]

7.     U.S. independent shale producers ("Independents") are companies that primarily focus on the exploration, development, and production of domestic shale resources. These companies are distinct from large vertically integrated energy companies, like Chevron and ExxonMobil (known as "supermajor(s)"), with diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources. For example, in 2019, only 7% of Chevron's total global crude oil produced was from U.S. shale operations.[5]

8.     Defendants Permian Resources Corp. f/k/a Centennial Resource Development ("Centennial"), Chesapeake Energy Corporation ("Chesapeake"), Continental Resources Inc. ("Continental"), Diamondback Energy, Inc. ("Diamondback"), EOG Resources, Inc. ("EOG"), Hess Corporation ("Hess"), Occidental Petroleum Corporation ("Occidental"), and Pioneer Natural Resources Company ("Pioneer"), collectively "Defendants," are among the largest Independents. Independents traditionally act as "swing producers" for the global oil market, with the ability to adjust

---

[3]     *Factors that impact gas prices*, NACS (Feb. 28, 2024), https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon.

[4]     Jeff Lenard, *Who Makes Money Selling Gas?,* NACS (Nov. 12, 2021), https://www.convenience.org/Media/conveniencecorner/Who-Makes-Money-Selling-Gas.

[5] *Chevron to boost Permian oil production as demand for reliable energy grows*, Chevron Newsroom (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows (Chevron produced 220,000 barrels of U.S. shale oil per day in 2019); *2019 supplement to the annual report*, CHEVRON CORP. (2020), https://www.chevron.com/-/media/shared-media/documents/annual-report-supplement-2019.pdf, at 11 (Chevron's total 2019 production was 3,058,000 barrels of oil equivalents per day).

shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.

9.      The U.S. experienced record-high crude oil prices beginning on or around January 2021, continuing through the present. Basic principles of supply and demand dictate that in their role as swing producers, Defendants should have increased production to capitalize on this price rise. Instead, Defendants collectively decided not to increase their U.S. shale oil production.

10.     Defendants' agreement is complimented by their cooperation and collusion with the Organization of the Petroleum Exporting Countries ("OPEC"), the international cartel of large oil producing nations, who also sought to raise oil prices through managing oil production during this period.

11.     Between 2017 and 2023, Defendants met and communicated regularly with each other, and with OPEC, to coordinate their collective oil output in response to market conditions. Following these meetings, representatives from Defendants consistently made public statements confirming these discussions and the exchange of confidential information. Specifically, Defendants also confirmed that they discussed with each other and OPEC their production strategies, future investment plans, and price targets. Likewise, when publicly discussing their meetings with Defendants, OPEC officials praised the cooperative nature of their developing relationship with Defendants.

12.     From the time when the meetings between U.S. shale producers and OPEC began in 2017 until the onset of the COVID-19 pandemic, worldwide oil prices and supply remained relatively stable.  In the early days of the COVID-19 pandemic, gasoline demand dropped precipitously, sending a shock through the oil supply chain.

13.     Gasoline demand, and thereby oil prices, recovered and ultimately began increasing at a rapid rate in 2021. The increase in the price of crude oil following COVID-19 was exacerbated by

the Russian invasion of Ukraine in late February 2022, which led to sanctions that largely sequestered Russian oil from the global market. This extended run of historically high crude oil prices provided prime market conditions for agile swing producers like Defendants – whose breakeven prices have never been lower and who operate in regions with a wealth of profitable opportunities – to aggressively increase production.

14.     But Defendants did not take advantage of this market opportunity. Rather, departing from their historical practice and rational independent self-interest, each Defendant limited their domestic shale production growth.

15.     Defendants' agreement to limit their respective shale production volumes has had the effect of fixing and/or stabilizing at an artificially high-level U.S. (and global) crude oil prices, which in turn fixed and/or stabilized retail gasoline prices in the United States at an artificially high level.

16.     Defendants' cartel is a per se unlawful restraint of trade under numerous state antitrust and competition laws. Plaintiffs and the Classes suffered substantial harm from the supracompetitive prices they paid for retail gasoline for personal use as a direct and proximate result of the cartel to constrain domestic production of shale oil in the United States. They bring this suit to recover that loss.

## PARTIES

17.     Plaintiff Castillo Construction and Management LLC is a New Mexico corporation with its principal place of business in Albuquerque, New Mexico (Bernalillo County). Castillo Construction Management LLC has purchased retail gasoline.

18.     Plaintiff John Castillo is a citizen of New Mexico and resides in Albuquerque. Mr. Castillo purchased retail gasoline.

19.     Plaintiff Southwest Elite Real Estate Inc. is a New Mexico corporation with its principal place of business in Albuquerque, New Mexico (Bernalillo County). Southwest Elite Real Estate Inc. has purchased retail gasoline.

20.     Defendant Permian Resources Corporation, known as Centennial Resource Development ("Centennial") during the relevant period, is a Delaware Corporation headquartered in Midland, Texas. Centennial's common stock is listed and traded on the New York Stock Exchange under the trading symbol PR. Centennial is an oil and gas production company that acquires and processes shale oil in Texas and New Mexico before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

21.     Defendant Chesapeake Energy Corporation ("Chesapeake") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. Chesapeake's common stock and warrants to purchase common stock trade on the Nasdaq Stock Market under the trading symbols CHK, CHKEW, CHKEZ, and CHKEL. Chesapeake is an oil and gas production company that acquires and processes shale oil in Louisiana and Pennsylvania, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

22.     Defendant Continental Resources Inc. ("Continental") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm, on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc. Continental is an oil and gas company that acquires and processes shale oil in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

23.     Defendant Diamondback Energy, Inc. ("Diamondback") is a Delaware Corporation headquartered in Midland, Texas. Diamondback's common stock is listed and traded on the Nasdaq

Stock Market under the trading symbol FANG. Diamondback is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

24.     Defendant EOG Resources, Inc. ("EOG") is a Delaware Corporation headquartered in Houston, Texas. EOG's common stock is listed and traded on the New York Stock Exchange under the trading symbol EOG. EOG is an oil and gas production company that acquires and processes shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

25.     Defendant Hess Corporation ("Hess") is a Delaware Corporation headquartered in New York, New York. Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES. Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country. Hess also sells the refined consumer gasoline across the United States.

26.     Defendant Occidental Petroleum Corporation ("Occidental") is a Delaware Corporation headquartered in Houston, Texas. Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively. Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

27.     Defendant Pioneer Natural Resources Company ("Pioneer") is a Delaware Corporation headquartered in Irving, Texas. Pioneer's common stock is listed and traded on the New York Stock Exchange under the trading symbol PDX Pioneer is an oil and gas production company

that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

28.     Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

29.     Where Plaintiffs ascribe an action to "Defendants," unless stated otherwise, the action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer.

30.     "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

31.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

32.     At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein. The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of shale oil production and crude oil prices.

33.     Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## JURISDICTION & VENUE

34.     This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), and Section 16 of the Clayton Act (15 U.S.C. §26), as well as the antitrust, fair competition, and consumer protection laws of various states. This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

35.     This Court has subject matter jurisdiction over Plaintiffs' claim under Section 16 of the Clayton Act, 15 U.S.C. §26, and under 28 U.S.C. §§1331, 1333(d), 1337(a), and 1367.

36.     This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiffs, residents of New Mexico, are citizens of a state different from Defendants, all of whom are either incorporated in Delaware or Oklahoma and headquartered in Oklahoma, Texas, or New York.

37.     This Court also has personal jurisdiction over all Defendants, and Venue in this District is proper, under the combination of 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d).

38.     Defendants' activities were within the flow of and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

39.     By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed class members. Defendants, directly and through their agents, engaged in activities affecting all states.

40.     Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the Class.

**FACTUAL ALLEGATIONS**

**A.      Organization of the Petroleum Exporting Countries ("OPEC")**

41.      OPEC, an intergovernmental organization made up of nations who purport to benefit from sovereign immunity to the Sherman Act,[6] controls close to 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices through coordinating its members' respective production levels.[7] Non-member nations historically keyed their oil production levels off OPEC guidance to benefit from the oil prices targeted by OPEC; a classic "umbrella pricing" situation.[8]

42.      Historically, Saudi Arabia acted as OPEC's (and thereby the global) swing producer – producers known for their ability to adjust production levels relatively rapidly in response to changes in market conditions and influence crude oil prices – leveraging its status as the member with the largest production capacity to become OPEC's de facto leader.[9]

---

[6] Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, I.A.E.E. ENERGY FORUM, Vol. 28, Issn 1944-3188 (Feb. 2019), https://www.iaee.org/documents/2019EnergyForum1qtr.pdf, at 17 (OPEC's stated mission is to "'coordinate and unify the oil policies of its member countries and ensure the stabilization of oil markets . . . .' The organization is also a significant provider of information about the international oil market. The current OPEC members are Algeria, Angola, Ecuador, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Qatar, the Republic of Congo, Saudi Arabia (the de facto leader), UAE and Venezuela.").

[7] Anshu Siripurapu & Andrew Chatzky, *OPEC in a Changing World*, COUNCIL ON FOREIGN RELS. (Mar. 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

[8] Salameh, *supra* n.6 ("In the 1980s, OPEC began setting production quotas for its member nations; generally, when the quotas are reduced, oil prices increase. . . . Since the 1980s, representatives from Egypt, Mexico, Norway, Oman, and Russia and other oil-exporting nations have attended many OPEC meetings as observers. This arrangement serves as an informal mechanism for coordinating policies.").

[9] *Id.*

43.     In December 2016 OPEC expanded its cartel, signing the first of several agreements with 10 other oil-producing nations (most notably Russia, whose production rivaled that of Saudi Arabia), forming what is now known as "OPEC+."[10]

44.     This long-resisted expansion of OPEC was done out of necessity.[11] By 2014, however, OPEC had lost its ability to exert complete control over global oil prices, thanks to the arrival of a new global oil player: the shale oil producer.

### B.     Shale Oil Producers Establish a "New World Order"

45.     Fracking changed everything. Equal parts controversial and successful upon its introduction in the early 2000's, within eight years of the first commercial shale operation coming online in Texas in 2002, U.S. shale producers were pumping enough shale oil to reverse a 35-consecutive-year trend of declining U.S. domestic crude oil production. The seven years starting from 2008 represented the fastest increase in domestic crude oil production in U.S. history – the "Shale Revolution."[12]

---

[10] *Id.* at 18 (In 2017, "Saudi Arabia was forced to eventually discard its [price war with U.S. Independents] strategy and engineer with Russia an OPEC/non-OPEC production cut agreement" in an attempt to regain control of crude oil prices. The agreement was extended through 2018 and converted into a "permanent mechanism for cooperation between OPEC and Russia in what has been dubbed as OPEC+."). Throughout this complaint, references to OPEC from December 2016 onwards encompass OPEC+.

[11] Guy Laron, The OPEC+ Puzzle: *Why Russian-Saudi Cooperation Starts – and Stops – with Oil Prices*, THE WILSON CENTER (Jan. 19, 2023), https://www.wilsoncenter.org/article/opec-puzzle-why-russian-saudi-cooperation-starts-and-stops-oil-prices (despite decades of tension and bad blood between Russia and Saudi Arabia, "[t]here was no way for OPEC to deal with the growing market power of the US without cooperating with the Russians"); *see also* Harry First & Darren Bush, *The U.S. Can Take on the Oil Cartel that Enables Putin, and Win*, THE N.Y. TIMES (June 3, 2022), https://www.nytimes.com/2022/06/03/opinion/gas-prices-russia-opec.html (Antitrust specialists have concluded that "as more countries joined or allied themselves with the [OPEC] cartel, it has only become more effective at controlling the output of what would otherwise have been competing oil producers.").

[12] Robert Rapier, *How The Shale Boom Turned the World Upside Down,* FORBES (Apr. 21, 2017), https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/?sh=497a463b77d2.

46.     Shale production posed a unique problem for OPEC. Unlike the supermajors, who typically invest in decades-long traditional drilling projects that require substantial lead time and infrastructure construction before production begins, shale oil wells: (a) require smaller capital commitments; (b) can be drilled in two to four weeks;[13] (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded. Consequently, production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors. According to market analysts, "the shale sector's ability to boost production – and to scale back – relatively quickly is its calling card,"[14] which makes U.S. shale oil, "*as close to inventory-on-demand as oil ever comes*."[15]

47.     But Independents are like the supermajors in one important respect that is problematic for OPEC: they are subject to the Sherman Act. This means that while U.S. shale would come to produce as much oil as the largest OPEC and OPEC+ nations,[16] it was not a monolith capable of making industry-wide production decisions. Rather, as a boon to gasoline consumers like Plaintiffs and members of the proposed Classes, U.S. shale producers were a group of relatively smaller producers, bound by law to compete with each other, and OPEC.

---

[13] Ryan Moore, *The Numbers: The Permian Excels*, PHEASANT ENERGY (last updated Sept. 7, 2023), https://www.pheasantenergy.com/the-numbers-the-permian-excels (Defendant Pioneer, the largest acreage holder in the Midland Basin of the Permian, reported that as of 2018, it was taking Pioneer approximately 15 to 20 days to drill a well down 10,000 feet and horizontal out to 20,000 feet).

[14] Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war.

[15] Steve LeVine, *Oil Hasn't Bottomed out, so Trade Now at Your Own Peril*, QUARTZ (Feb. 10, 2015), https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

[16] By 2018, the United States eclipsed Saudi Arabia and Russia as the largest oil producer in the world. Devin Krishna Kumar, U.S. expected to end 2018 as world's top oil producer: EIA, REUTERS (Dec. 11, 2018), https://www.reuters.com/article/us-usa-oil-eia-outlook/u-s-expected-to-end-2018-as-worlds-top-oil-producer-eia-idUSKBN1OA21D.

48. So U.S. shale's arrival on the global oil scene in the early-to-mid-2010s was a nightmare for OPEC. The U.S. shale movement was dubbed "Cowboyistan"[17] in the industry for Independents' "drill-first, ask-questions-later" business model.[18] A "new oil order" had emerged.[19] The aggressive competition of U.S. shale producers usurped the Saudi swing producer role,[20] and saw U.S. domestic production erode OPEC-set cartel price premiums.

### C.   Cowboyistan Must Die: the 2014-2016 "OPEC Price War"

49. As sovereign nation-states with GDPs (and, in some cases, currencies) heavily reliant on crude oil prices, OPEC was not about to willingly cede the pricing power OPEC had held over global oil prices for a half-century to U.S. shale producers.

50. Perhaps underestimating the willingness of American companies to flaunt the Sherman Act, or perhaps the result of a rebuffed invitation(s) not yet publicly known, at some point in 2014, OPEC determined Cowboyistan could not be bought and had to go.

---

[17] Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan for U.S. Domination of Global Oil*, FORBES (Mar. 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/?sh=bc9df884ed2.

[18] Barney Jopson, *Fracking: The Energy revolution that shook the world*, FIN. TIMES (May 21 6, 2015), https://www.ft.com/content/6fab1192-f30d-11e4-a979-00144feab7de.

[19] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[20] Hailey Lee, *Why OPEC's Losing Its Ability to Set Oil Prices, CNBC* (Oct. 27, 2014), https://www.cnbc.com/2014/10/27/us-shale-replaces-opec-as-leading-swing-producer-goldman.html (U.S. shale's spare capacity – the amount of crude a country is able to produce in 30 days in case of an emergency – was almost four times that of Saudi Arabia's); David Livingston & Eugene Tan, *Shale's True Contribution to the Oil Market*, CARNEGIE ENDOWMENT FOR INT'L PEACE (July 9, 2015), https://carnegieendowment.org/2015/07/09/shale-s-true-contribution-to-oil-market-pub-60659 ("consensus has developed that Saudi Arabia has surrendered its role as de facto manager of the world oil market to U.S. shale oil producers" because "shale wells take less time to drill and complete than comparatively larger conventional oil projects, which require years and many millions of dollars to move from planning into first production").

51.     Consequently, despite a global oversupply of crude oil, in mid-2014 OPEC made a deliberate long-term choice to maintain, rather than reduce, its production levels to win back the market share it had lost to Independents, and to push oil prices to a level that would render U.S. shale oil no longer economically viable.[21] This two-year period of open global competition, dubbed within the industry as the "OPEC Price War," had begun:



52.     The OPEC Price War dragged on for years for two reasons. First, shale production was a brand-new industry where technological advancements and accumulating experience was driving

---

[21] Siripurapu & Chatzky, *supra* n.7; Javier Blas, *Wall Street is Finally Going to Make Money Off the Permian*, BLOOMBERG (Apr. 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off (In February 2016, Saudi Arabia's Oil Minister Al-Naimi warned U.S. shale producers, "[l]ower costs, borrow cash, or liquidate.").

breakeven points lower,[22] allowing Independents to exploit less productive shale plays profitably.[23] Second, the U.S. legal structure (including corporate and bankruptcy law), encourages business formation and risk-taking, making business failure less economically devastating to the individuals involved.

53. As a result, by implementing cost-cutting measures and focusing on the most productive shale plays to remain competitive in the lower-price environment, many U.S. shale producers, including Defendants, continued to drill at consistent levels despite the price drop caused by OPEC's Price War.[24]

---

[22] In the beginning of 2014, "Rystad Energy estimated the average breakeven price for tight oil to be $82 per barrel," but by 2018, the average breakeven price reported had dropped to $47 per barrel, and by 2021, $37 per barrel. *See Rystad Energy: As falling Costs Make New Oil Cheaper to Produce, Climate Policies May Fail Unless they Target Demand*, ROGTEC MAGAZINE (Nov. 17, 2021), https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand/; Maitham A. Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 (July 2023), https://econjournals.com/index.php/ijeep/article/view/14455 ("This continuous decrease in the break-even price of shale oil made the US shale oil industry more flexible to face fluctuations in oil prices" and "[d]espite the drop in prices from about $100 a barrel in 2014 to $64 a barrel in 2019, shale oil production has doubled by 100% during this period.").

[23] A shale oil "play" refers to a specific geographic area or region where shale formations contain significant amounts of oil that can be economically extracted. The top three shale oil plays in the U.S. are the Permian Basin in Texas and New Mexico (40% of all U.S. crude production in 2022), the Bakken Formation in North Dakota and Montana, and Eagle Ford in Texas. Technological advancements have made more shale oil plays economically viable over time.

[24] Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production).

54.     Yet, the OPEC price war consolidated the U.S. shale industry, causing dozens of smaller Independents to fail[25] and larger Independents, like Defendants, to rally together in the face of a shared adversary.

**D.      If you Can't Beat 'Em: Cowboyistan Takes a Seat at the "Table on Pricing"**

55.     Weary after years of low prices,[26] OPEC changed tactics. First, as noted above, in December 2016, it struck a deal with 10 non-OPEC oil producing nations to form OPEC+. Having brought one enormous potential competitor (Russia) into the fold, OPEC turned its attention to Cowboyistan.

56.     Unable to beat Independents in the free market, OPEC started a years-long campaign to bring them into the cartel.

57.     Independents, too, were weary of the price war. As reported by MarketWatch on September 8, 2016, "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[27] Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to slide in crude oil prices."[28] Hamm and Defendants had gained leverage and the respect of OPEC during the price war. Now,

---

[25] Matt Egan, *OPEC tried to put this US shale oil driller out of business. It 'backfired'*, CNN BUSINESS (May 12, 2017), https://money.cnn.com/2017/05/12/investing/shale-oil-ceo-opec/index.html.

[26] Mufson, *supra* n. 24 (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices. But its success has been slow, limited and remains fragile. And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

[27] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

[28] *Id.*

Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball with OPEC.

58.    Shortly thereafter, in early 2017, Defendants and members of OPEC began meeting and sharing dinners together.[29] Many of these meetings took place on the sidelines of the CERAWeek Conference, held annually in Houston, Texas.

59.    March 6-10, 2017 – Houston, TX, USA (CERAWeek Conference): Former Nigerian politician and then-OPEC General Secretary Mohammed Barkindo "dined with about two dozen U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., John Hess of [Defendant] Hess Corp., Robert Douglas Lawler of [Defendant] Chesapeake Energy Corp. and Tim Leach of Concho Resources Inc."[30] OPEC had purportedly never before met with U.S. shale producers,[31] leading to reporters describing the meeting as "unusual."[32] Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries."[33] Scott Sheffield of

---

[29] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War,* REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10/#:~:text=Energy-,As%20oil%20prices%20soar%2C%20U.S.%20shale%2C%20OPEC%20in%20no,rush%20to%20resume%20price%20war&text=March%2010%20(Reuters)%20%2D%20U.S.,rush%20to%20rapidly%20boost%20production. (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

[30] Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week,* BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[31] *Id.*

[32] *Id.*

[33] *Id.*

Defendant Pioneer stated, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US [I]ndependents than I have seen over my entire career."[34]

60.     Indeed, CERAWeek 2017 served as a channel for OPEC's Secretary General to "garner views and opinions from other senior oil industry executives" in "bi-lateral" meetings with shale executives, according to Defendant Hess's CEO, John Hess.[35] Following a dinner with OPEC officials, Hess reported to Bloomberg, "***It was a very good exchange of information and views about oil*** . . . I really commend the OPEC Secretary General for outreach. It was a good talk."[36] OPEC Secretary General Barkindo confirmed everyone was on the same page regarding the need to collectively work to achieve price stability following the meeting, because "no-one wants to see a repeat of 2015 and 2016."[37]

61.     During CERAWeek 2017, OPEC and the U.S. shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet.[38] Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih warned U.S. shale producers that if they wanted to collaborate, there would be no "free rides" on OPEC production

---

[34] David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says,* BLOOMBERG, (Mar. 7, 2017),    https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts?embedded-checkout=true#xj4y7vzkg.

[35] CERAWeek 2017: Encouragement & engagement, 47 OPEC BULLETIN 2, (Mar./Apr. 2017), https://docplayer.net/55519391-Vienna-austria-save-the-date-june-hofburg-palace-vienna-austria.html, at 16.

[36] Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[37] OPEC BULLETIN, *supra* n.35, at 15.

[38] Blas, *supra* n.36.

cuts, and they must be ready to pull their weight when the time comes.[39] Put another way, OPEC told U.S. shale producers that OPEC expected Independents to work together and coordinate their production cuts alongside OPEC.

62. Later that year OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[40] Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental Resources during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[41]

63. March 5, 2018 – Houston, TX, USA (CERAWeek Conference): In February 2018, discussing plans to meet with U.S. shale executives for the second year in a row at the upcoming March 2018 CERA Week conference, Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[42] Barkindo explained that OPEC and the U.S. shale industry agreed at their first meeting in 2017, that they had a "shared responsibility" towards the oil markets.[43] The 2018 CERAWeek dinner between OPEC members and U.S. shale producers, including Defendants, was organized to "further explore the mechanic of achieving our common objective" of stable production volumes and prices, per Barkindo.[44]

---

[39] Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, REUTERS (Mar. 9, 2017), https://www.reuters.com/article/us-ceraweek-saudi-shale/exclusive-saudis-tell-u-s-oil-opec-wont-extend-cuts-to-offset-shale-sources-idUSKBN16G2TJ.

[40] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. 25 TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[41] *Id.*

[42] Blas & Smith, *supra* n.30.

[43] *Id.*

[44] *Id.*

64.     On March 5, 2018, OPEC officials met with U.S. shale executives at Houston's "The Grove" restaurant, during which Secretary General Barkindo gave a speech to dinner attendees. Afterwards, Defendant Pioneer's then-CEO Tim Dove summarized Barkindo's speech to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth." Defendant Centennial's CEO, Mark Papa described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[45]

65.     OPEC representatives, including Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, described the meeting between OPEC and U.S. shale executives as much more than generalizations, with the key takeaway being a shared commitment to exchange confidential production information: "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics."[46] Lima explained that, by sharing this information, "[w]hat we are doing is avoiding volatility," or put another way – coordinating production decisions to impact the price of crude oil rather than allowing market forces to dictate outcomes.[47]

66.     Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu agreed that it was time for U.S. shale to "take some responsibilities in terms of stability of oil prices."[48] Indeed,

---

[45] Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energy-opec-shale/rpt-%20ceraweek-u-s-shale-and-opec-share-steak-in-uneasy-truce-at-houston-dinner-idUKL2N1QP05R.

[46] *Id.*

[47] *Id.*

[48] Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energy-nigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stable-idINKBN1GH347.

Secretary General Barkindo confirmed that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[49] Barkindo explained that OPEC and Defendants "compared notes on our experiences in this cycle [i.e., the recent price war] which everyone agreed was the most injurious."[50]

67.     As one shale executive, who insisted on remaining anonymous, described it to Reuters, Cowboyistan had parlayed their successful price-war resistance into a seat at OPEC's "**table on pricing**."[51]

68.     In the wake of the 2018 conference, Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, even "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."[52]

69.     June, 2018 – Vienna, Austria (7th OPEC International Seminar): Following the CERAWeek 2018 dinner, Secretary General Barkindo invited U.S. shale officials to join him at an

---

[49] *OPEC bulletin Special Edition: OPEC international energy dialogues,* OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51.

[50] Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

[51] Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa/opec-to-meet-with-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

[52] Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS via YAHOO!NEWS (June 18, 2018), https://www.yahoo.com/news/continental-resources-ceo-harold-hamm-162200046.html.

OPEC summit in Vienna in June 2018.[53] Defendant's executives Scott Sheffield (Pioneer) and John Hess (Hess) attended the June 2018 OPEC International Seminar in Vienna, Austria. At the event, Sheffield spoke for all Defendants when he said, "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[54] Sheffield urged, "OPEC needs to fulfill its duty."[55]

70.    Critically, the 2018 OPEC summit in Austria was the first time Defendants admitted publicly to more than listening to OPEC during these meetings. Sheffield admitted speaking to the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference . . . . If they don't we are going to see $100 oil or higher."[56]

71.    Sheffield delivered a message, and apparently got one in return – two days before OPEC's June 22, 2018, production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[57]

---

[53] Domm, *supra* n.50.

[54] Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS  (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rsc-idINKBN1JG2OB.

[55] *Id.*

[56] Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D*, BLOOMBERG (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[57] *Compare id.* (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million . . . and that will phase in over the next few months.") *with* Rania El Gamal,  et al., *OPEC agrees modest hike in oil supply after Saudi and Iran compromise*, REUTERS (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd),  or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]").

72.     January, 2019 – Davos, Switzerland (World Economic Forum): In January 2019 at the Davos World Economic Forum, OPEC's Secretary General sat on a panel with John Hess, CEO of Defendant Hess Corp, Vicki Hollub, CEO of Defendant Occidental, and Dan Yergin, Vice Chairman of IHS Markit.[58]

73.     According to Reuters, Hess and Hollub both "said that [the] growth of U.S. shale oil output would slow" in the near future.[59] OPEC's Secretary General addressed the current oil market dynamics at Davos, highlighting the importance of OPEC+ in helping stabilize the oil market over the past two years following the price war.[60] He also underscored that market uncertainties and volatility are detrimental to industry investments, and that continuing joint and collaborative efforts among producers were crucial to ensure timely investments.[61]

74.     These comments were praised by Hess, who said that "the Secretary General of OPEC, as well as OPEC Members, play a very important role in stabilizing markets for oil, so those efforts are to be recognized."[62] Referencing OPEC's relationships with Defendants, Barkindo emphasized, "[w]e have to continue to collaborate. It is one industry. It is a global industry, and I think our colleagues in the US are on the same page with us and we will work together to exchange views."[63]

75.     March 11-14, 2019 – Houston, TX, USA (CERAWeek Conference): For the third consecutive year, U.S. shale executives met with OPEC members during CERAWeek. Bloomberg

---

[58] IHS performs market analyses on behalf of OPEC member nations.

[59] Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow,* REUTERS (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG.

[60] *Id.*

[61] *Id.*

[62] Tom DiChristopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer group deserves praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html.

[63] *Id.*

reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[64] Discussing his upcoming meeting with U.S. shale executives, Secretary General Barkindo shared, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers . . . . It is essential we continue the conversation with U.S. shale industry."[65]

76.    Barkindo reported that a Monday night dinner attended by CEOs John Hess, Vicki Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and Diamondback, respectively,[66] included a "friendly conversation on current industry issues and the immediate prospects and challenges for all."[67] Diamondback CEO Stice spoke with reporters directly after what he called "a very good session" between OPEC and Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[68]

---

[64] Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-with-shale-competitors-for-third-year-1.1227226.

[65] *Id.*

[66] *CERAWeek 2019 in Review – New World of Rivalries: Reshaping the Energy Future,* CERAWEEK.COM (Mar. 2019), https://cdn.ihsmarkit.com/www/pdf/0819/CW19Review.pdf; Javier Blas & Rachel Adams-Heard*, OPEC Splits Avocado Appetizer with Shale Adversaries in Texas*, BLOOMBERG (Mar. 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year#xj4y7vzkg.

[67] Blas & Adams-Heard, *supra* n.66.

[68] *Id.*



*Hess (left) was pictured with OPEC Secretary General Mohammed Barkindo (center) in Houston on March 11, 2019[69]*

77.     In January 2019, OPEC and its allies began new production cuts, agreeing to reduce supply by 1.2 million bpd over the next six months.[70] After the cuts were announced, Reuters reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[71] At CERAWeek 2019, Barkindo indicated that OPEC and allies will continue supply adjustments through 2019.[72]

**E.      2021: Defendants Actualize Their Agreement with OPEC**

---

[69] *Id.*

[70] Alex Lawler, *OPEC posts first 2019 oil-output rise despite Saudi cuts*, REUTERS (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

[71] Jennifer Hiller, *U.S. shale producers see OPEC pullback helping 2019 profits,* REUTERS (Dec. 8, 2018), https://www.reuters.com/article/idUSL1N1YC20I/#:~:text=HOUSTON%2C%20 Dec%207%20(Reuters),would%20keep%20their%20profits%20flowing.

[72] *OPEC Secretary General on Saudi Arabia's oil production, Venezuela and NOPEC*, CNBC (Mar. 12, 2019), https://www.cnbc.com/video/2019/03/12/opec-secretary-general-on-saudi-arabias-oil-production-venezuela.html.

78.     It is unclear when, exactly, Defendants began coordinating their output in conjunction with OPEC. Through the end of 2018, it at least appeared to the outside world that OPEC's pleas were falling on deaf ears:

**Figure 2: Change in Crude-Oil Production – U.S. Shale Oil v. OPEC (2014 – 2019)[73]**



79.     Indeed, analysts predicted that 2019 would be the start of "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[74]

80.     The second wave never occurred. In 2020, lockdowns associated with the COVID-19 pandemic cratered gasoline demand, sending multiple shocks through the world oil markets.

---

[73] Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826.

[74] *Id.*

Worldwide oil production fell,[75] and the U.S. shale oil industry consolidated and suffered as production fell and smaller Independents went bankrupt.[76]

81. During this economic turmoil, Defendants and OPEC signaled to each other their willingness to end their price war and market share competition once-and-for-all and collaborate on their respective production levels, and consequently, global crude oil prices. In July 2020, OPEC's Secretary General made it clear that OPEC could inflate and sustain high crude prices if Defendants played ball: "We were able to reach out to the U.S. [I]ndependents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. . . . Everybody has a role to play. . . . We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well from industry."[77] On November 28, 2020, Defendant EOG Resources' CEO Bill Thomas confirmed Defendants' willingness, as a group, to follow OPEC's lead on pricing: "In the future, certainly we believe OPEC will be the swing producer – really, totally in control of oil

---

[75] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html (due to the global Coronavirus pandemic and market panic, OPEC members agreed to "slash[] output [of crude oil] by a record-shattering 9.7 million barrels per day").

[76] Irina Slav, *Shale Executives See Little Chance of Significant Growth*, OILPRICE.COM via BUSINESS INSIDER (Dec. 6, 2020), https://markets.businessinsider.com/news/stocks/shale-executives-see-little-chance-of-significant-growth-1029867633 ("Between January and October, 43 oil and gas producers in North America filed for bankruptcy protection. Most of them were from the shale patch.").

[77] *OPEC Secretary General: No objective to drive US shale out of business,* OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretary-general-no-objective-to-drive-us-shale-out-of-business.

prices. . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[78]

82. When the world emerged from the pandemic in early 2021, gasoline demand surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021. As OPEC and OPEC+ countries emerged from the pandemic, they collectively withheld production to push up prices further.[79]

83. Defendants also responded to rising prices by withholding production, suddenly (and in near-unison) preaching supply "discipline" for the first time in the history of U.S. shale. Over the course of 2021, Defendants would continue to signal to each other, OPEC, and the market that they were no longer competing for market share or willing to act as swing producers:

      a.    In a February 2021 interview, Defendant Chesapeake CEO Doug Lawler explained that U.S. shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[80] Defendant Pioneer CEO Scott Sheffield agreed, predicting that small companies would increase output but in the aggregate U.S output would remain flat, even if crude prices go above $60, as the large U.S. Independents would jointly practice discipline.[81]

---

[78] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.

[79] Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[80] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

[81] *Id.*

b.  In March 2021, on the same day OPEC announced supply restrictions, Defendant Occidental CEO Vicki Hollub said that despite a "healthier supply and demand environment" and "a V-shaped" post-pandemic recovery, U.S. oil production would not return to pre-pandemic heights, because Defendants and other U.S. shale producers were "committed to value growth, rather than production growth."[82]

c.  In April 2021, Pioneer CEO Sheffield said that U.S. shale producers risked another price war with OPEC and its allies if they resumed the breakneck production growth of the last decade. He also balked at the federal government's forecasts that predicted an increase in domestic oil production, and instead declared he was "totally against" any production increase as "producers now know the stakes and will stick to their mantra of capital discipline."[83]

d.  In a June 2021 interview with Reuters, Sheffield said he was "confident the producers will not respond" to the high crude oil prices by increasing production, because they were focused on "shareholder returns."[84] According to Reuters, "[i]n the United States, closely held companies have contributed

---

[82] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html#:~:text=Occidental%20CEO%20Vicki%20Hollub%20said,Evolve%20conversation%20with%20Brian%20Sullivan.

[83] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

[84] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/.

substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[85]

e.    On an August 5, 2021, earnings call, Defendant EOG President and CEO Bill Thomas, echoing Lawler's February 2021 language, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started. I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."[86]

f.    On October 3, 2021, Defendant Pioneer CEO Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control,"[87] reflecting Defendants' production restraint agreement. Sheffield reaffirmed Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year no matter the price of crude oil, explaining "everybody's going to be disciplined, regardless whether it's $75 Brent,[88] $80 Brent, or $100 Brent . . . ."[89]

---

[85] *Id.*

[86] EOG Resources (EOG), *Q2 2021 Earnings Call Tr.*, THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[87] Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

[88] "Brent" refers to Brent crude, a widely recognized benchmark for pricing crude oil internationally. The price of Brent crude oil is determined through trading on the Intercontinental Exchange ("ICE") in London. It is often used as a reference point for setting oil prices.

[89] Brower & Sheppard, *supra* n.87.

84. Given that Defendants' breakeven prices at the time were around $40/barrel,[90] Defendants' newly-discovered restraint came as a surprise to some oil industry observers:

   a.  In January 2021, Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[91]

   b.  In June 2021, another Reuters columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[92] 2021's "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[93] However, the author observed that Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. . . . Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts

---

[90] EOG Resources, *Value Matters: 4Q 2021 Presentation, (2022)*, https://s24.q4cdn.com/589393778/files/doc_financials/2021/q4/EOG_0222.pdf (Defendant EOG's price needed to secure 10% return on capital, not breakeven, was ~$40); Occidental Petroleum Corp., Q3 2020 Earnings Call Tr., OXY.COM (Nov. 10, 2020), https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/OXY3Q20Transcript.pdf (Defendant Occidental's breakeven price ~$40); Diamondback Energy, *Investor Presentation* (Nov. 2021), at Slide 11, https://www.diamondbackenergy.com/static-files/532c60b3-f8f0-4f43-8368-91b9f4b628e2 (Defendant Diamondback Energy's 2021 breakeven price was "approximately $32 per barrel.").

[91] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (Jan. 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

[92] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[93] Hampton, *supra* n.91.

and investors."[94] The author noted that "there is a broad consensus among OPEC+ countries and the U.S. shale industry on the need for slower output growth, higher prices, and wider profit margins."[95]

    c.    On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new strategy, telling Chesapeake CEO that their plans to slow production would be "the easiest way to destroy value" for the company in the long term.[96]

85.    OPEC, however, was not surprised. In early 2021, OPEC estimated that U.S. shale production would see a significant annual drop. Reuters reported that anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[97] OPEC also signaled that the price war was over. Secretary General Barkindo told Reuters that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Independents and OPEC "have a shared responsibility in this regard."[98]

**F.    2022-2023: $200 a barrel? No Thanks**

86.    In 2022, after Russia invaded Ukraine, crude oil prices spiked. Unlike the steep fall in demand during the early days of COVID-19, this was a supply-side shock that resulted in a decrease

---

[94] Kemp, *supra* n.92.

[95] *Id.*

[96] Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results – Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nick-dellosso-on-q4-2021-results-earnings-call.

[97] Lawler & Hiller, *supra* n.80.

[98] *Id.*

in the volume of oil available in the U.S. market, both from increased strain on supply chains, and more importantly, the separation of Russia's oil production from the world market.

87. By mid-2022, oil crossed $120 a barrel. At this price, oil cost more than at any point during the five-year runup to the OPEC Price War, and nearly quadruple the 2016 price war low water mark.

88. OPEC responded to the possibility that the high prices might recede with further production restraint, including cuts in October 2022 of "two million barrels per day." These amounts were announced as crude prices began to normalize from their near-record highs, and were intended to "stabilize the recent fall in global energy prices."[99]

89. Despite record prices in 2022 and consistently high prices in 2023, in a break from their prior behavior,[100] Defendants refused to increase production in an independently economically rational manner:

> a. In February of 2022, as Russian troops staged on the Ukrainian border in advance of the invasion, Sheffield again made comments that support the existence of an agreement between and among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line" and "I'm confident they will

---

[99] Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/.

[100] *See* Lawler & Scheyder, *supra* n.51; Erik Norland, *As Oil Prices Plunge, What Will Swing Producers Do?*, CME GROUP (Nov. 21, 2018), https://www.cmegroup.com/education/featured-reports/as-oil-prices-plunge-what-will-swing-producers-do.html (in the past, "higher [crude oil] prices incentivized an enormous increase in U.S. production", and even OPEC members understood that "[i]t's normal for shale oil, tight oil [production] to increase . . . whenever oil prices support it.").

continue to stay in line."[101] Indeed, following the massive 2022 oil price spike during which oil prices increased 20% between just January and February 2022, Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"[102]

b.  Later in February, other Defendants signaled their alignment. During an earnings call, Defendant Continental's CEO Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years. . . ."[103]

c.  Defendant Diamondback's executive Stice explained on February 22, 2023, "we have no reason to put growth before returns . . . we will continue to be disciplined."[104]

d.  Bloomberg reported on February 24, 2022 that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers. . . . like [Defendant] Pioneer Natural Resources and [Defendant] Continental Resources[, who] are also limiting increases to less than 5% this year."[105]

---

[101] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively,* OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms%20said%20this%20week.

[102] *Id.*

[103] *Id.*

[104] Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[105] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

e.      In March 2022, Occidental Petroleum's CEO Vicki Hollub stated that Occidental had a "huge inventory of high-quality investments" available around the world, especially in U.S. shale, but was not acting on those opportunities to expand production, instead focused on maintaining high profits.[106]

f.      On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to "low single digits" in 2023 and it was "committed to remaining disciplined" despite ideal economic conditions for production increases.[107] In 2022, EOG increased production by only 4% and said it was targeting the same increase in 2023.[108]

g.      In January 2023, Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."[109]

h.      When asked in a March 2023 interview why Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's President, Vicki Hollub responded that "prices are in a good place right now,"

---

[106] Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

[107] EOG Resources (EOG), *Q2 2022 Earnings Call Tr.*, THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[108] Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05/.

[109] Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

"gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand and lower U.S. consumer gas prices, despite having the ability to profitably increase production.[110]

90.    Again, knowing Independents' breakeven prices were continuing to fall,[111] oil industry observers expressed disbelief at Defendants' refusal to compete for market share:

a.    In the words of the Washington Post, the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[112]

b.    A February 2022 Bloomberg article wondered why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields."

---

[110] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[111] E.g., Press Release, *Continental Resources Announces Record 2021 Results; 2022 Projections Highlight Increasing Cash Flow and Corporate Returns, News Release (Exhibit 99.1)*, SEC ARCHIVES (Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/732834/000119312522042827/d272362dex991.htm (Defendant Continental reported that for 2022 it was "projecting an approximately $30 WTI free cash flow breakeven price."); Centennial Resource Development Inc., *2022 Corporate Sustainability Report*, PERMIAN RES.COM (2022), https://permianres.com/wp-content/uploads/2022/08/Centennial-2022-Corporate-Sustainability-Report.pdf. ($32 breakeven for Defendant Centennial); *Using Scenarios to Understand Risks, Opportunities*, CHESAPEAKE ENERGY (2023), https://sustainability.chk.com/climate/portfolio-resilience/ (Defendant Chesapeake breakeven between $33 and $42); *Investor Relations Presentation, May 2022*, HESS CORP. (May 2022), https://investors.hess.com/static-files/3814592c-05ea-4659-9651-88012e29468f (Defendant Hess breakeven ~$45); *The Value Portfolio: Pioneer Natural Resources is Heavily Undervalued*, SEEKING ALPHA (Aug. 9, 2023), https://seekingalpha.com/article/4593056-pioneer-natural-resources-heavily-undervalued (Defendant Pioneer breakeven $39); Irina Slav, *Running Out of Sweet Spots: Shale Growth May Not Materialize*, MARKETS INSIDER (Feb. 7, 2022), https://markets.businessinsider.com/news/stocks/running-out-of-sweet-spots-the-biggest-problem-for-us-shale-1031168908 ("Technologically, oil and gas resources can be stretched to near infinity as drilling technology advances further and further.").

[112] Denning, *supra* n.14.

The article said that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[113]

c.  In March 2022, a CNBC anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[114]

d.  Again, in March 2023, the Financial Times published an article titled, "Oil executives warn of higher prices now that OPEC is back 'in charge.'"[115] Another March 2023 article, this one from CNBC, was titled "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO."[116]

e.  On April 3, 2023, after OPEC made further cuts, Bloomberg reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high gas prices, despite being "flush with cash after record

---

[113] Crowley, *supra* n.105.

[114] Stevens, *supra* n.106.

[115] Myles McCormick, Derek Brower, & Justin Jacobs, *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[116] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

profits."[117] According to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[118]

91.     Defendants also continued meeting with OPEC officials in 2022 and 2023:

a.     **2022**: Once again, Defendants met with OPEC officials during the 2022 CERAWeek Conference in Houston, Texas between March 6-10, 2022. Reuters reported that at the time of this conference, "[i]t was at least the fourth time since 2017 that U.S. shale oil producers and OPEC officials have held such meetings to discuss energy concerns."[119] In Houston, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy."[120] As Reuters noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[121]

---

[117] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

[118] *Id.*

[119] Liz Hampton & Arathy Somasekhar, *OPEC Meets with U.S. Shale Executives as Oil Prices Skyrocket*, REUTERS (Mar. 7, 2022), https://www.reuters.com/business/opec-meet-with-us-shale-executives-us-energy-conference-oil-prices-skyrocket-2022-03-08/#:~:text=HOUSTON%2C%20March%207%20(Reuters),prices%20soared%20over%20supply%20concerns. In attendance: EQT Corp Chief Executive Officer Toby Rice, Hess Corp CEO John Hess and Chesapeake Energy CEO Domenic Dell'Osso.

[120] Hampton, *supra* n.29.

[121] *Id.*

Chesapeake CEO Domenic Dell'Osso confirmed that "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[122]

b.  **2023**: In March, 2023, FT reported that "about two dozen [U.S. shale executives] including [Defendants' executives:] Sheffield [of Pioneer], . . . Nick Dell'Osso of Chesapeake Energy, Travis Stice of Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais[123] for a private dinner in a downtown Houston steakhouse" to reaffirm their agreement to restrict production, "[d]espite recent record profits."[124] During this dinner, it was reported that "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner."[125] In the article, Sheffield doubled down on his support of OPEC, "I think the people

---

[122] *Id.*

[123] In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor. Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he passed away. According to the New York Times, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces." Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies,* THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html.

[124] Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[125] *Id.*

that are in charge now are three countries – and they'll be in charge the next 25 years. . . . Saudi first, UAE second, Kuwait third."[126]

92.    Early in 2023, Defendants removed all doubt that they were coordinating with OPEC.

93.    On January 5, 2023, Defendant Pioneer's CEO Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to change . . . . If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut . . . . [W]e'll see what happens in the next 90 days."[127]

94.    87 days later, OPEC "shocked traders around the world"[128] when it announced a "surprise" production cut, when OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[129]

95.    In between Sheffield's prediction and the reveal, on March 27, 2023, news emerged that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements. This left Defendants "suddenly vulnerable" and exposed them to massive economic risk if oil prices went down.[130]

---

[126] *Id.*

[127] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa#xj4y7vzkg.

[128] *Id.*

[129] Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

[130] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

96.     Indeed, Defendant Pioneer's CEO Sheffield defended the extraordinarily risky move, stating "we're not going to hedge," and that he was still "optimistic that we'll see $100 a barrel before the end of the year."[131]

97.     Less than a week after news emerged of Defendants' exposed positions, on April 2, 2023, OPEC announced their "surprise" production cut, slashing 1.15 million barrels of oil production per day.[132] Defendants' failure to hedge was inexplicable but for their advanced knowledge of OPEC's planned production cuts.

98.     In April 2023, an energy analyst succinctly summarized the effects of Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up. That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects. Today, shale is as responsive as in the past. But there's a difference. ***The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share.*** Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.[133]

99.     Independents had the ability to increase production and gain market share, they just chose not to:

**Table 1: Defendants' U.S. Oil Production Growth Rates In pre- and post-Class Period**

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| Centennial/Permian[134] | 123% | 56% |

---

[131] *Id.*

[132] Reuters, *supra* n.129.

[133] Blas, *supra* n.21.

[134] On September 1, 2022, Centennial Resources merged with Colgate Energy Partners II, LLC to form Permian Resources. *Centennial, Colgate Finalize $3.9B Merger; Debut as Permian Resources Corp,*

| | | |
|---|---|---|
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

100.    Defendants' production restraint agreement worked. Defendants are reaping the rewards in the form of massive revenue increases, while not reinvesting that additional revenue into new production. Compare Figure 3 with Figures 4, 5, 6, 7, 8, 9, and 10 (recording Defendants' revenue growth after 2020).

**Figure 3. U.S. Shale Producer's Reinvestment Rate (capital expenditure as a percentage of operational cash flow)**

SHALE EXPERTS (Sept. 1, 2022), https://www.shaleexperts.com/articles/Centennial-Colgate-Finalize-3.9B-Merger-Debut-as-Permian-Resources-Corp_999951603. Accordingly, the 56% figure listed in Table 1 for Centennial is its 2021-2022 pre-merger growth rate as public figures do not permit Plaintiffs to back-out production figures from Colgate's rigs post-acquisition.



**Figure 4. Pioneer's Annual Revenue (USD)**



**Figure 5. Permian/Centennial's Annual Revenue (USD)**



**Figure 6. Chesapeake's Annual Revenue (USD)**

**Figure 7. Continental's Annual Revenue (USD)**



**Figure 8. Diamondback's Annuel Revenue (USD)**



**Figure 9. EOG's Annual Revenue (USD)**



**Figure 10. Occidental's Annual Revenue (USD)**



G.   **Defendants' "Restraint" Is Economically Irrational, Absent Agreement**

101.   The terms Defendants used may have varied: being "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns." But they are all code words for each Defendants' agreement to coordinate and restrain domestic shale oil production.

46

Further, Defendants' repeated public confirmation of their production discipline was an admission that they each had spare productive capacity that they chose not to utilize.

102.     In a competitive market for arguably the most important commodity on earth: crude oil, expanding production to take advantage of prices above your breakeven is the economically rational response. If you do not, your competitor will; taking margin share and reinvesting their additional profits into further productive capacity and/or efficiency gains. Defendants taught OPEC this lesson during the Shale Revolution.

103.     In a competitive market, no single Defendant would restrain production unless they **knew** their competitors would also restrain their production. No business in a competitive market would turn down opportunities to make three times marginal cost (i.e., breakeven), and couch that economically irrational decision with a preposterous statement about focusing on "shareholder returns." In a competitive market, if you are not drilling that oil, someone else is.

104.     And others did drill some of that oil. Notoriously conservative and well-known to view fracking as a waste of time (in part because their overhead structure made small-scale operations relatively more expensive), the supermajors started investing in shale in 2021 and 2022 at rates previously unseen, in direct response to U.S. shale producers "underinvesting as an industry":[135]

      a.    ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25% in response to record high crude oil prices.[136]

---

[135] Clifford Krauss, *What Exxon & Chevron are Doing with Those Big Profits*, THE N.Y. TIMES (Feb. 1, 2023), https://www.nytimes.com/2023/02/01/business/energy-environment/exxon-chevron-oil-gas-profit.html

[136] Kevin Crowley, et al*., Exxon and Chevron Plan Permian Oil Surge as Peers Preach Caution*, BLOOMBERG (Feb. 2, 2022), https://www.bloomberg.com/news/articles/2022-02-01/exxon-joins-chevron-in-permian-oil-surge-as-peers-preach-caution.

b.  Similarly, Chevron planned on a 10% increase in the same region in 2022 "from an even larger production base."[137]

c.  Mid way through 2022, Chevron anticipated a "15% year-over-year increase" in shale oil production from 2021 and promised to continue "bolstering production."[138]

d.  In May 2023, ExxonMobil Chief Executive Darren Woods said that Exxon is hoping to double the amount of oil produced from its U.S. shale holdings over a five-year period using new technologies.[139]

105.  Smaller, non-public shale companies drilled some of that oil, too. In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead."[140] Due to the gap in production left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[141] For example, Reuters reported that, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[142]

---

[137] *Id.*

[138] *Chevron to Boost Permian Oil Production as Demand for Reliable Energy Grows*, CHEVRON (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows.

[139] Sabrina Valle, *Exxon CEO Says Technology Advances Could Double Its Shale Output*, REUTERS (June 1, 2023), https://www.reuters.com/business/energy/exxon-ceo-says-5-year-program-could-double-its-shale-output-2023-06-01/#:~:text=Exxon%20CEO%20says%20technology%20advances%20could%20double%20its%20shale%20output,-By%20Sabrina%20Valle&text=HOUSTON%2C%20June%201%20(Reuters),year%20period%20using%20new%20technologies..

[140] Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, Reuters (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/.

[141] *Id.*

[142] *Id.*

106.     But small shale oil producers going from one rig to two is not enough to meaningfully move U.S. production when Defendants control nearly 20% of the total active oil rigs in the U.S., including conventional oil rigs and rigs owned by supermajors.[143] With those rigs, in 2023 Defendants were responsible for approximately 16.2% of U.S. total crude oil production (including conventional crude oil). Defendants are able to leverage their collective market share because of how fragmented the domestic oil market is: of the 247 companies operating oil rigs in the U.S., 162 companies are running just one rig.[144] Only 10 companies own 15 or more rigs – five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are supermajors (Exxon, Chevron, and ConcoPhillips).[145]

107.     Moreover, Defendants' market power is exacerbated by the fact that conventional oil production in the U.S. is largely fixed and cannot quickly add or remove production volume in response to price changes.

108.     OPEC believes itself to be outside the reach of the Sherman Act, so OPEC doesn't use code words when describing its coordination with, and the coordination amongst, Defendants: OPEC and Defendants "collaborate,"[146] "compare[] notes[s],"[147] "work together to exchange views,"[148] discuss "how [OPEC and Defendants] should proceed going forward,"[149] "further explore

---

[143] Data obtained from https://oilgasleads.com/top-drilling-company/ on March 11, 2024.

[144] *Id.*

[145] *See supra* n.143.

[146] DiChristopher, *supra* n.62.

[147] *OPEC bulletin Special Edition, supra* n.49, at 51 (OPEC Secretary General Barkindo).

[148] DiChristopher, *supra* n.62.

[149] *OPEC bulletin Special Edition, supra* n.49, at 51 (OPEC Secretary General Barkindo).

the mechanic of achieving [OPECs and Defendants'] common objective,"[150] and discuss OPECs and Defendants' "shared responsibility"[151] for global oil markets.

109.    Whether expressed in code words or frank terms, Defendants' agreement by and between themselves and OPEC to coordinate U.S. domestic shale oil production is *per se* illegal under the Sherman Act.

## PLUS FACTORS

110.    The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the U.S. shale oil industry highly conducive to collusion. Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[152] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[153]

111.    The following plus and super plus factors alleged herein support an inference that Defendants' actions constituted a per se unlawful price-fixing conspiracy, not merely parallel conduct:

a.    The market conditions for U.S. shale oil are favorable to collusion. As discussed above, the U.S. shale oil industry is highly fragmented, with a small number of larger producers and hundreds of smaller producers. These larger

---

[150] Blas & Smith, *supra* n.30 (OPEC Secretary General Barkindo).

[151] Sam Meredith, *OPEC Calls on US Shale Oil Producers to Accept 'Shared Responsibility' of Slashing Global Supply*, CNBC (Oct. 10, 2017), https://www.cnbc.com/2017/10/10/opec-calls-on-us-shale-oil-producers-to-accept-shared-responsibility.html (OPEC Secretary General Barkindo).

[152] William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[153] *See id.* at 426.

producers (Defendants) have excess capacity; and have industry trade associations they regularly take part in, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy. As detailed above, Defendants did in fact meet during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that excess capacity.

b.  The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand.[154]

c.  Defendants' actions were against Defendants' independent self-interests but for the existence of an agreement. As detailed above, Defendants repeatedly met with each other and OPEC representatives and discussed amongst themselves and with OPEC representatives their confidential business plans, including forward-looking production and capacity information. No rational business would share this proprietary and competitively sensitive information with a direct competitor, absent collusion. Following these exchanges, Defendants then decided not to increase their respective production volumes when that would have been in their individual rational economic best interests,

---

[154] Gasoline itself has highly inelastic demand, meaning that very few consumers will switch to alternative products as the price at the pump rises. This reinforces the inelasticity of upstream demand for crude oil.

given rising prices. Instead, Defendants withheld production in a manner that would only be in their individual rational economic best interests if Defendants had an agreement between themselves and OPEC to coordinate production levels so as to maintain crude oil prices at artificially high levels. Defendants repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.

## ANTITRUST INJURY

### Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Crude Oil Throughout the Class Period

112.    Historically, global crude oil demand was primarily met by oil obtained from conventional drilling. Following the Shale Revolution, the influence of U.S. shale production on crude oil prices (and gasoline prices) is undeniable, a fact recognized by market analysts and economists.

a.    A Forbes article from 2019, claims that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because, since 2008, "U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."[155]

b.    In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, US shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.[156]

---

[155] Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=249e989b5125.

[156] Irma Alonso Alvarez 7 Virginia Di Nino, *The oil market in the age of shale oil*, 8 ECB ECON. BULLETIN, 57-74 (2017).

c. In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors declared that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.[157]

d. In 2020, economists from the Federal Reserve Bank of Dallas found that without the shale oil revolution, oil prices would have risen by 36% in 2018.[158]

e. In 2023, an article in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."[159]

113.    As noted above, U.S. Independents' output decisions have a disproportionate impact on the price of crude oil because they are swing producers for the global market.[160] When competing with each other (and OPEC), as the largest Independents in a very fractured production landscape, Defendants have sufficient market power to dictate whether the U.S. can produce enough shale oil in response to high crude prices to "swing" the market and push prices down.

114.    Defendants acknowledge that they have this power and are choosing not to use it. For example, on March 2, 2022, the New York Times reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have

---

[157] *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, COUNCIL OF ECON. ADVISORS (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[158] Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market,* FED. RESERVE BANK OF DALLAS (June 17, 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[159] Rodhan, *supra* n.22, at 433-43.

[160] Lee, *supra* n.20.

said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices . . . ."[161]

115.    Since at least 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

116.    Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total U.S. shale production. In 2022, U.S. shale oil production increased by only 500,000 barrels, which was 50% short of market analysts' general yearly estimates.[162]

117.    Instead of providing price relief at the pump, Defendants took advantage of supply chain bottlenecks caused by global crises like COVID and Russia's invasion of Ukraine to obtain record profits and fund expanded stock buybacks, which benefitted only Defendants and their shareholders.[163]

**Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Retail Gasoline Purchased by Plaintiffs and the Class**

118.    Gasoline consumers in the U.S., like Plaintiffs and the proposed class members, purchase gasoline from gas stations. Approximately 54% of the U.S. price of gasoline is comprised of

---

[161] Stanley Reed, *As Oil Soars, OPEC and Its Allies Decline to Offer Relief*, The N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[162] Eric Rosenbaum, *Oil CEOs are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax*, CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

[163] Ro Khanna et. al., *Congressional Letter to FTC Chair Lina Khan*, Congress of the United States (Mar. 6, 2024), https://khanna.house.gov/sites/evo-subsites/khanna.house.gov/files/evo-media-document/Letter%20to%20FTC%20on%20Big%20Oil%20Consolidation.pdf.

the price of crude oil used in the manufacturing process.[164] Consequently, as recognized by the U.S. Energy Information Administration, "[r]etail gasoline prices are mainly affected by crude oil prices . . . ."[165]

119.    Indeed, Defendants' own trade association, the American Petroleum Institute admits that "the price of crude oil is the primary determinant of the price we pay at the pump"[166] and that "[n]ationwide on a quarterly basis, crude oil prices have explained more than 90% of the variation in [U.S.] gasoline prices since 2020."[167] Plaintiffs confirmed this relationship by conducting their own preliminary regression analysis of monthly U.S. gasoline prices between 2001 and 2023, in which monthly refiner acquisition crude oil prices was the only variable.[168] This regression returned a R-

---

[164] *The Four Main Factors that Influence U.S. Gas Prices*, U.S. DEP'T OF ENERGY (last accessed Feb. 26, 2024), https://www.energy.gov/sites/default/files/2023-04/GasPriceFactors2.jpg.  The remainder of gasoline prices are driven by distribution and marketing costs (16%), refining costs (14%) and taxes (16%).

[165] *Gasoline explained: Gasoline price fluctuation*, U.S. ENERGY INFO. ADMIN. (last updated Apr. 19, 2023), https://www.eia.gov/energyexplained/gasoline/price-fluctuations.php#:~:text=Gasoline%20prices%20generally%20follow%20crude%20oil%20prices.&text=Gasoline%20prices%20tend%20to%20increase,expected%20gasoline%20demand%20or%20consumption.

[166] *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Prices*, AM. PETROLEUM INST., (last accessed Mar. 11, 2024), https://www.api.org/oil-and-natural-gas/energy-primers/gas-prices-explained#:~:text=The%20primary%20factors%20impacting%20gasoline,gasoline%20retailers%20pay%20to%20distributors.

[167] *Id. See also Factors that impact gas prices,* NACS (Apr. 05, 2023) https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon ("Retail gasoline prices move an estimated 2.4 cents per gallon for every $1 change in the price per barrel [of crude oil].").

[168] A regression analysis is a statistical method that describes the relationship between two or more variables. The regression method tests the relationship between a dependent variable (here gasoline prices) against independent variables (here crude oil prices). Plaintiffs used the "Refiner Acquisition Cost of Crude Oil" and "Weekly Retail Gasoline" data series maintained by the U.S. Energy Information Administration.

square of 90%.[169] Put another way, between 2001 and 2023, Plaintiffs' preliminary regression found that 90% of gasoline price variations in the U.S. can be explained by the prevailing crude oil price.

120.    That crude oil prices drive gasoline prices is not surprising when one considers how crude oil moves through the supply chain from Defendants to consumers. Defendants and other producers of crude oil sell crude oil to refineries, who use chemical separation and reaction processes to convert crude oil into gasoline and other products (*e.g.,* diesel oil, jet fuel, and other manufacturing feedstocks). The refineries then transport the gasoline to bulk terminal storage facilities. Because crude oil is the main raw material used to refine gasoline sold in the United States, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Class who were forced to purchase gasoline at artificially inflated levels.

**Figure 11. U.S. Gasoline Supply Chain**



---

[169] R-square is a statistical measure in a regression model that determines the proportion of the variance in the dependent or "response" variable (gasoline price) that can be explained by the independent variable or "mean" (crude oil prices paid by refiners). A R-square of 0% represents a model that does not explain any of the variation in the response variables around the mean and a R-square of 100% represents a model that explains all the variation in the response on the mean.

121.     Gas stations purchase gasoline wholesale from refiners (or other gasoline marketers who have purchased from the refineries) at a price that is directly tied to the price that was paid by refineries for crude oil, including crude oil sold to those refineries by Defendants. Gas stations set the price of retail gasoline above the wholesale price they pay, therefore passing on to Plaintiffs and the Classes any increase in the wholesale price. Indeed, the National Association of Convenience Stores, a body which represents American gas stations, has confirmed that gas stations mark up the price they pay for gasoline by 35 cents a gallon on average when setting the price at the pump.[170] This can be seen in Figure 12 immediately below, which shows that U.S. gas prices follow the prices paid by U.S. refineries for crude oil.

**Figure 12. Refiners Crude Oil Acquisition Costs vs U.S. Average Gasoline Prices (Adjusted for Inflation)**



---

[170] Lenard, *supra* n.4.

122.    Therefore, the price of crude oil has a direct effect on the price of retail gasoline.[171]

Because crude oil is the main raw material used to refine gasoline sold in the United States, and because changes in crude oil prices drove changes in gasoline prices paid by Plaintiffs and members of the Classes throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline at artificially inflated levels.

## CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representatives of a class of indirect sellers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

> All persons and entities who purchased retail gasoline for personal use from a gas station in the United States between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

124.    Plaintiffs also bring this action on behalf of itself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following Class ("State Law Class"):

> All persons and entities who purchased retail gasoline from a gas station in Arizona, California, Colorado, Connecticut, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and/or Wisconsin between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

125.    Specifically excluded from these Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any

---

[171] Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html (In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too little" of their "record profits" to ramp up domestic production and "used those record profits to buy back their own stock, rewarding their CEOs.").

affiliate, legal representative, heir, or assign of any Defendant. Also excluded from both Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

126.    Both Classes are so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members but the above-defined classes are readily identifiable and are ones for which records should exist. Plaintiffs believe that due to the nature of the product market there are at least millions of members of both Classes in the United States.

127.    Common questions of law and fact exist as to all members of both Classes. Plaintiffs and both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes, and relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

> a.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or gasoline in the United States;
>
> b.    the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> c.    whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;
>
> d.    whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Classes;
>
> e.    whether Defendants caused Plaintiffs and the Classes to suffer damages in the form of overcharges on gasoline;

      f.     the effect of Defendants' alleged conspiracy on the prices of retail gasoline sold in the United States during the Class Period;

      g.     the appropriate Class-wide measure of damages; and

      h.     the nature of appropriate injunctive relief to restore competition in the U.S. market for gasoline.

128.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of both Classes. Plaintiffs and all members of both Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for gasoline sold in the U.S., resulting from price-fixing in the crude oil market by cartel members.

129.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

130.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

131.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

132.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would

create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

133. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## CLAIMS FOR RELIEF

### A. VIOLATION OF THE SHERMAN ACT

**COUNT I: Violation of 15 U.S.C. §1**
**(On Behalf of the Nationwide Injunctive Relief Class)**

134. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

135. From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for crude oil and retail gasoline in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

136. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil and retail gasoline.

137. The combination and conspiracy alleged herein has had the following effects, among others:

    a. Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

b.  Prices for crude oil sold by Defendants and all their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c.  Those who purchased retail gasoline indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition and paid artificially high prices for gasoline.

138.  Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses and property by paying more for retail gasoline purchased indirectly from the Defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

139.  Plaintiffs and members of the Classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

**B.   VIOLATIONS OF STATE ANTITRUST LAWS**

140.  Plaintiffs repeat and reiterate the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

141.  During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

142.  In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes; exchange of competitively

sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

143.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase gasoline than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

144.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

145.    Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

146.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

147.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### Count II: Violation of Arizona's Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*

148.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

149.    By reason of the conduct alleged herein, Defendants have violated ARIZONA REV. STAT. § 44-1401, *et seq.*

150.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. Bunker's Glass Co. v. Pilkington PLC, 206 Ariz. 9, 11-20 (2003).

151.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the oil market, a substantial part of which occurred within Arizona.

152.    Defendants' violations of Arizona law were flagrant.

153.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce (gasoline).

154.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

155.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under Arizona Revised Statutes Section 44-1401, *et seq.*

156.    In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with ARIZ. REV. STAT. ANN. § 44-1415(A). Plaintiffs will file proof of such service with the Court.

### Count III: Violation of California's Cartwright Act,
### Cal. Bus. & Prof. Code § 16700 *et seq.*

157.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

158.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

159.     Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

160.     A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. Id. at § 16726.

161.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the oil market, a substantial part of which occurred within California.

162.     Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq.*

163.     Plaintiffs and members of the Class purchased retail gasoline within the State of California during the Class Period. But for Defendant's conduct set forth, the price of retail gasoline would have been lower, in an amount to be determined at trial.

164.     Plaintiffs and members of the Class were with respect to purchases of gasoline in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### Count IV: Violation of the Colorado Antitrust Act,
### Colo. Rev. Stat. Ann. § 6-4-101, *et seq.*

165.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

166.     Plaintiffs and members of the Class purchased Defendants' oil within Colorado during the Class Period. But for Defendants' conduct set forth herein, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

167.     The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations Colorado antitrust law for actual damages. *See* C.R.S. § 6-4-115 (emphasis added).

168.     Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq.*

169.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Colorado and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

### Count V: Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. Ann § 35-24, *et seq.*

170.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

171.     Plaintiffs and members of the Class purchased Defendants' oil within Connecticut during the Class Period. But for Defendants' conduct set forth, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

172.     The Connecticut Antitrust specifically allows a private act of recovery for indirect purchasers by prohibiting a defendant from "assert[ing] a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* C.G.S.A. § 35-46a.

173.     Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation C.G.S.A. § 35-24, *et seq.* Defendants' conducts and conspiracies restrained, suppressed, and eliminated the price competitive for oil; raised, fixed, maintained, and stabilized oil prices at artificially high levels, while depriving Plaintiffs and members of the Class of free and open competition. These acts resulted in Plaintiffs and members of the Class paying supracompetitive, artificially inflated prices for retail gasoline.

174.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Count VI: Violation of District of Columbia Antitrust Act,**
**D.C. Code § 28-4501, *et seq.***

175.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

176.     Plaintiffs and members of the Class purchased Defendants' oil within the District of Columbia during the Class Period. But for Defendants' conduct set forth, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

177.     Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

178.     Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia in violation of D.C. CODE § 28-4501, *et seq.*

179.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**Count VII: Violation of Hawaii Antitrust Act,**
**Haw. Rev. Stat. Ann § 480-1, *et seq.***

180.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

181.     Plaintiffs and members of the Class purchased retail gasoline within Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

182.     The Hawaii Antitrust Act specifically allows a private act of recovery for indirect purchasers. *See* HRS § 480-13.3.

183.     Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation of H.S.R. § 480-1, *et seq.*

184.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Hawaii and are entitled to all forms of relief, including actual damages, as well as interest and reasonable attorneys' fees and costs.

### Count VIII: Violation of Illinois Antitrust Act,
### 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

185.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

186.     Plaintiffs and members of the Class purchased Defendants' oil within the State of Illinois during the Class Period. But for Defendants' conduct set forth, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

187.     Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN.10/7(2).

188.     Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices for oil sold within the State of Illinois.

189.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### Count IX: Violation of Iowa Competition Law,
### Iowa Code § 553.1, *et seq.*

190.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

191.     Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. Comes v. Microsoft Corp., 646 N.W.2d 440, 449-51 (Iowa 2002).

192.     Plaintiffs and members of the Class purchased Defendants' oil within the State of Iowa during the Class Period. But for Defendants' conduct set forth, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

193.     Defendants contracted, combined or conspired to restrain trade in the oil market, in violation of Iowa Code § 553.1, *et seq*.

194.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

### Count X: Violation of Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq*.

195.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

196.     The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." Kan. Stat. Ann. § 50-112.

197.     Plaintiffs and members of the Class purchased retail gasoline within the State of Kansas during the Class Period.

198.     But for Defendants' conduct set forth, the price of retail gasoline would have been lower, in an amount to be determined at trial.

199.     Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

200.    Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### Count XI: Violation of Maine's Antitrust Statute, Me. Rev. Stat. Ann. Tit. 10 § 1101, *et seq.*

201.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

202.    Plaintiffs and members of the Class purchased retail gasoline within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

203.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

204.    Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

### Count XII: Violation of Maryland's Antitrust Statute, Md. Code Ann. § 11-201, *et seq.*

205.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

206.    The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

207.    Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE. ANN. § 11-209(b)(2)(i).

208.    Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

209.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

### Count XIII: Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*

210.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

211.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq.*).

212.     Plaintiffs and members of the Class purchased Defendants' oil within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

213.     Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

214.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

### Count XIV: Violation of the Minnesota Antitrust Law, Minn. Stat. §§ 325D.49 *et seq.* & 325D.57 *et seq.*

215.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

216.     The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into . . . whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

217.     Plaintiffs and members of the Class purchased Defendants' retail gasoline the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

218.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

219.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

220.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with MINN. STAT. § 325D.63.

### Count XV: Violation of the Mississippi Antitrust Statute, Miss. Code Ann. § 75-21-1, *et seq.*

221.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

222.     Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

223.     "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

224.     Plaintiffs and members of the Class purchased retail gasoline within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

225.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

226.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

### Count XVI: Violation of the Missouri Merchandising Practices Act,
### Mo. Ann. Stat. § 407-010, *et seq.*

227.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

228.     Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

229.     Plaintiffs and members of the Class purchased retail gasoline within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

230.     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. Gibbons v. J. Nuckolls, Inc., 216 S.W.3d 667, 669 (Mo. 2007).

231.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### Count XVII: Violation of the Nebraska Junkin Act,
### Neb. Rev. Stat. § 59-801, *et seq.*

232.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

233.    Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

234.    Plaintiffs and members of the Class purchased retail gasoline within the State of Nebraska during the Class Period. But for Defendants' conduct set forth, the price of retail gasoline would have been lower, in an amount to be determined at trial.

235.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. § 59-821.

236.    Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### Count XVIII: Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*

237.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

238.    The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

239.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. § 598A.060.

240.     Plaintiffs and members of the Class purchased retail gasoline within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of retail gasoline would have been lower, in an amount to be determined at trial.

241.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

242.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Nevada in that at least thousands of sales of retail gasoline took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

243.     Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

244.     In accordance with the requirements of § 598A.210(3), Plaintiffs mailed notice of this action to the Nevada Attorney General.

### Count XIX: Violation of New Hampshire's Antitrust Statute, N.H. Rev. Stat. Ann. Tit. XXXI, § 356:1, *et seq.*

245.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

246.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

247.     Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

248.     Plaintiffs and members of the Class purchased Defendants' oil within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

249.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II). Defendants established, maintained or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq.*

250.     Plaintiffs and members of the Class were injured with respect to purchases of Defendants' oil in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

### Count XX: Violation of the New Mexico Antitrust Act,
### N.M. Stat. Ann. § 57-1-1, *et seq.*

251.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

252.     The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

253.     Plaintiffs and members of the Class purchased retail gasoline within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

254.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

255.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

### Count XXI: Violation of Section 340 of the New York General Business Law,
### N.Y. Gen. Bus. Law § 340, *et seq.*

256.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

257.     Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

258.    Plaintiffs and members of the Class purchased retail gasoline within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

259.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

260.    Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq.*

261.    Pursuant to New York General Business Law § 340(5), counsel for Plaintiffs has sent letters by certified mail, return receipt requested, to the Attorney General of New York, informing the Attorney General of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of the original complaints filed by plaintiffs.

### Count XXII: Violation of the North Carolina General Statutes, N.C. Gen. Stat. § 75-1, *et seq.*

262.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

263.    Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

264.    Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* Hyde v. Abbott Labs., Inc., 123 N.C. App. 572, 584 (1996).

265.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

266.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

267.     By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq.*

### Count XXIII: Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*

268.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

269.     The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq.*

270.     Plaintiffs and members of the Class purchased retail gasoline within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

271.     Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51- 08.1-08.

272.     Defendants' violations of North Dakota law were flagrant.

273.     Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

274.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq.*

**Count XXIV: Violation of the Oregon Antitrust Law,**
**Or. Rev. Stat. § 646.705,** *et seq.*

275.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

276.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

277.    Plaintiffs and members of the Class purchased retail gasoline within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

278.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

279.    Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**Count XXV: Violation of the Rhode Island Antitrust Act,**
**6 R.I. Gen. Laws § 6-36-1,** *et seq.*

280.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

281.    The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

282.     Plaintiffs and members of the Class purchased retail gasoline within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

283.     Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

284.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

285.     In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. GEN. LAWS § 6-36-21. Plaintiffs will file proof of such service with the Court.

**Count XXVI: Violation of the South Dakota Antitrust Statute,**
**S.D. Codified Laws § 37-1-3.1, *et seq.***

286.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

287.     Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

288.     Plaintiffs and members of the Class purchased retail gasoline within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

289.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

290.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**Count XXVII: Violation of the Tennessee Trade Practices Act,**
**Tenn. Code § 47-25-101, *et seq.***

291.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

292.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE, § 47-25-101.

293.     Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See* Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 520 (Tenn. 2005).

294.     Defendants competed unfairly and colluded by meeting to restrain output, fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

295.     Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for retail gasoline was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for retail gasoline were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for oil.

296.     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as retail gasoline refined from Defendants oil was sold in Tennessee.

297.     Plaintiffs and members of the Class purchased retail gasoline within the State of Tennessee during the Class Period. But for Defendants' conduct set forth, the price of retail gasoline would have been lower, in an amount to be determined at trial.

298.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Count XXVIII: Violation of the Utah Antitrust Act,**
**Utah Code Ann. § 76-10-3101, *et seq.***

299.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

300.     The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

301.     Plaintiffs and members of the Class purchased retail gasoline within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

302.     Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

303.     Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

304.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with UTAH CODE ANN. § 76-10-3109(9).

**Count XXIX: Violation of the West Virginia Antitrust Act,
W. Va. Code § 47-18-1, *et seq.***

305.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

306.    The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

307.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

308.    Plaintiffs and members of the Class purchased Defendants' oil within the State of West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of Defendants' oil would have been lower, in an amount to be determined at trial.

309.    Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq.*, may bring an action for damages under W. Va. Code § 47-18-9.").

310.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

311.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for retail gasoline than they otherwise would have paid in the absence of Defendants' unlawful conduct.

312.     As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

### Count XXX: Violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.01, *et seq.*

313.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

314.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

315.     Plaintiffs and members of the Class purchased retail gasoline within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth, the price of retail gasoline would have been lower, in an amount to be determined at trial.

316.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

317.     Defendants contracted, combined or conspired in restraint of trade or commerce of oil, with the intention of injuring or destroying competition, in violation of WIS. STAT. § 133.01, *et seq.*

318.     Plaintiffs and members of the Class were injured with respect to purchases of Defendants' oil in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for retail gasoline in Wisconsin.

319.     Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## <u>VIOLATIONS OF STATE UNFAIR AND TRADE PRACTICES LAWS</u>

320.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

321.     Defendants above-described scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and the members of the Class paid higher prices for Defendants' oil than they should have.

322.     The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and members of the Class could not reasonably have avoided injury from Defendants' wrongful conduct.

323.     Plaintiffs and members of the Class purchased goods, namely retail gasoline, primarily for personal, family, or household purposes.

324.     There was and is a gross disparity between the price that Plaintiffs and the members of the Class paid for retail gasoline and the value they received.

325.     The following claims for relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Class.

### Count XXXI: Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL")

326.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

327.     The violations of federal antitrust law set forth above also constitute violations of Section 17200, *et seq.* of the California Business and Professions Code.

328.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

329. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

330. Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Section 16720, *et seq.*, of California Business and Professions Code, set forth above.

331. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

332. Plaintiffs and members of the Class are entitled to, inter alia, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

333. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

334. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause members of the Class to pay supra-competitive and artificially-inflated prices for retail gasoline sold in the State of California. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

### Count XXXII: Violation of the District of Columbia Consumer Protection Procedures Act,
### D.C. Code § 28-3901, *et seq.*

335.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

336.     Plaintiffs and members of the Class purchased retail gasoline for personal, family, or household purposes.

337.     By reason of the conduct alleged herein, Defendants have violated D.C. CODE § 28-3901, *et seq.*

338.     Defendants are "merchants" within the meaning of D.C. CODE § 28- 3901(a)(3).

339.     Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

340.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

341.     By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. CODE § 28-3901, *et seq.*

### Count XXXIII: Violation of Florida Deceptive and Unfair Trade Practices Act,
### Fla. Stat. § 501.201(2), *et seq.*

342.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

343.     The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

344.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

345.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

346.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. *See* FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

347.    Plaintiffs and members of the Class purchased retail gasoline within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

348.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

349.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property by virtue of overcharges for retail gasoline and are threatened with further injury.

350.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

### Count XXXIV: Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ch. 93A § 1, *et seq.*

351.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

352.    By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, *et seq.*

353. Plaintiffs and members of the Class purchased retail gasoline within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

354. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

355. Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

356. Plaintiffs and members of the Class purchased goods, namely retail gasoline, primarily for personal, family, or household purposes.

357. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

358. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Massachusetts General Laws ch. 93A § 9.

359. The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Defendants because, upon information and belief, Defendants have not identified a place of business or assets within Massachusetts.

### Count XXXV: Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code § 30-14-103, *et seq.*, and § 30-14-201, *et seq.*

360. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

361. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*

362.     Defendants' unlawful conduct had the following effects: (1) retail gasoline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (2) Plaintiffs and members of the Class were deprived of free and open competition; and (3) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for retail gasoline.

363.     Plaintiffs and members of the Class purchased goods, namely retail gasoline, primarily for personal, family, or household purposes.

364.     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

365.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30 14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### Count XXXVI: Violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, *et seq.*

366.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

367.     By reason of the conduct alleged herein, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq.*

368.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609.

369.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

370.     Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class' ability to protect themselves.

371.     Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

372.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

373.     By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under NEB. REV. STAT. § 59-1614.

### Count XXXVII: Violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*

374.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

375.     By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

376.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

377.     Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

378.     Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

379.     Defendants' conduct was willful.

380.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

381.     By reason of the foregoing, Plaintiffs and members of the Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

### Count XXXVIII: Violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI § 358-A:1, *et seq.*

382.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

383.    By reason of the conduct alleged herein, defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq.*

384.    Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See* LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 92-100 (2007).

385.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

386.    Defendants' conduct was willful and knowing.

387.    Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class' ability to protect themselves.

388.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

389.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

390.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief available under New Hampshire Revised Statutes §§ 358-A:10 and 358-A:10-a.

### Count XXXIX: Violation of the New Mexico Unfair Practices Act,
### N.M. Stat. Ann. § 57-12-1, *et seq.*

391.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

392.    By reason of the conduct alleged herein, Defendants have violated N.M. STAT. § 57-12-3, *et seq.*

393.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

394.     Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

395.     Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and members of the Class and the price paid by them for Defendants' oil as set forth in N.M. STAT. § 57- 12-2E.

396.     Defendants' conduct was willful.

397.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

398.     By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

### Count XXXX: Violation of the North Carolina Unfair and Deceptive Trade Practices Act,
### N.C. Gen. Stat. § 75-1.1, *et seq.*

399.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

400.     By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.* Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* Hyde v. Abbott Labs., Inc., 123 N.C. App. 572, 584 (1996).

401.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

402.     Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

403.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

404.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

405.    As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

406.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**Count XXXXI: Violation of the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13-1.1, *et seq.***

407.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

408.    By reason of the conduct alleged herein, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq.*

409.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

410.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

411.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

412.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

413.    Defendants' conduct was willful.

414.    Plaintiffs and members of the Class purchased goods, namely retail gasoline, primarily for personal, family, or household purposes.

415.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

416.    By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.2.

### Count XXXXII: Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*

417.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

418.    By reason of the conduct alleged herein, Defendants have violated S.C. CODE ANN. § 39-5-10, *et seq.*

419.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class' ability to protect themselves.

420.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

### Count XXXXIII: Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, Ch. 63 § 2451, *et seq.*

421.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

422.    By reason of the conduct alleged herein, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq.*

423.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, inter alia, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT ANN. tit. 9, § 2453(a).

424.    Plaintiffs and members of the Class purchased retail gasoline within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price of retail gasoline would have been lower, in an amount to be determined at trial.

425.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see* also Elkins v. Microsoft Corp., 174 Vt. 328, 341 (2002).

426.    Defendants competed unfairly by restraining trade as set forth herein, in violation of VT. STAT. tit. 9, § 2453, *et seq.*

427.    Defendants' violations of Vermont law were flagrant.

428.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

429.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

430.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

431.    Plaintiffs and members of the Class were injured with respect to purchases of retail gasoline in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

a.    Certifies the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

b.    Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

c.      Enters judgment against Defendants, and in favor of Plaintiffs and the Class, holding Defendants liable for the antitrust violations alleged;

d.      Awards a declaratory judgment that Defendants restraint of trade was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for oil in violation of the Sherman Act, § 1.

e.      Grants permanent injunctive relief:

   i.      enjoining Defendants from engaging in future anticompetitive conduct in the shale oil market; and

   ii.     requiring Defendants to take affirmative steps to dissipate the continuing effects of its prior unlawful conduct;

f.      Awards Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with law;

g.      Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendant's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

h.      Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

i.      Directs such further relief as it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: June 4, 2024.                    Respectfully submitted,

Christopher A. Dodd
DODD LAW OFFICE, LLC
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2742
chris@doddnm.com

Warren T. Burns *(to be admitted pro hac vice)*
Daniel H. Charest *(to be admitted pro hac vice)*
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202

Telephone.: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com

Korey Nelson *(to be admitted pro hac vice)*
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Telephone: (504) 799-7845
knelson@burnscharest.com

Rex A. Sharp *(to be admitted pro hac vice)*
Isaac L. Diel *(to be admitted pro hac vice)*
W. Greg Wright *(to be admitted pro hac vice)*
Brandon C. Landt *(to be admitted pro hac vice)*
Hammons P. Hepner *(to be admitted pro hac vice)*
SHARP LAW LLP
4820 W. 75th Street
Prairie Village, KS 66208
Telephone: (913) 901-0505
rsharp@midwest-law.com
idiel@midwest-law.com
gwright@midwest-law.com
blandt@midwest-law.com
hhepner@midwest-law.com

Steven N. Williams *(to be admitted pro hac vice)*
Kai'Ree K. Howard *(to be admitted pro hac vice)*
STEVEN WILLIAMS LAW, P.C.
201 Spear Street, Suite 1100
San Francisco, California 94105
Telephone: 415-697-1509
swilliams@stevenwilliamslaw.com
khoward@stevenwilliamslaw.com

Charles D. Gabriel
CHALMERS, ADAMS, BACKER &
KAUFMAN, PLLC
13200 Strickland Road, Suite 114-177
Raleigh, North Carolina 27613
Telephone: (404) 493-1843
cdgabriel@chalmersadams.com

***Attorneys for Plaintiffs and Proposed Class***